**A & S COUNCIL OIL COMPANY, INC., et al., Appellees,**

v.

**Philip LADER, in his official capacity as Administrator of the United States Small Business Administration, Appellant.**

**No. 93–5345.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 16, 1995.

Decided June 9, 1995.

Daniel F. Van Horn, Asst. U.S. Atty., Washington, DC, argued the cause for appellant. With him on the briefs were Eric H. Holder, Jr., U.S. Atty., R. Craig Lawrence

and John D. Bates, Asst. U.S. Attys., Washington, DC.

Julius E. Mensah, Indianapolis, IN, argued the cause and filed the brief for appellees.

Before: BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

In the early 1980s the Small Business Administration subcontracted with three minority-owned small businesses to perform federal procurement contracts under its § 8(a) program. The companies lost money—or at any rate failed to make the profits they anticipated. They sued the SBA's Administrator, alleging that the SBA acted arbitrarily and capriciously and in excess of its statutory authority because the contract prices failed to guarantee them a "reasonable profit". The district court found that the SBA was "unjustly enriched" by its enforcement of the contracts, and that "[t]his unjust enrichment amounts to a taking of private property without just compensation in violation of the fifth amendment to the Constitution of the United States." *A & S Council Oil Co., Inc. v. Saiki,* 799 F.Supp. 1221, 1235, 1238–39 (D.D.C.1992) (*"A & S Council"*). On that basis, the court awarded plaintiffs money damages of $3.3 million, plus interest from the time of the alleged taking. *A & S Council Oil Co., Inc. v. Bowles,* Civ. No. 87–1969–OG, order at 1–2 (D.D.C. Sept. 28, 1993).

We find that plaintiffs' claims cannot properly be characterized as "takings" claims. Furthermore, though at times plaintiffs cloak the claims in language evocative of the Administrative Procedure Act, 5 U.S.C. § 702 (1988), they are in fact contract claims covered by the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601–613 (1988 & Supp. V 1993). The CDA provides the exclusive avenue for relief for all such contract claims against the United States. But because the plaintiffs failed to exhaust their administrative remedies under the CDA, no judicial review is available to them. We therefore reverse and remand to the district court with instructions to dismiss the case.

\* \* \*

Under its § 8(a) program, the Small Business Administration enters supply contracts with federal government procurement agencies and then arranges to perform those contracts by subcontracting with "socially and economically disadvantaged small business concerns". 15 U.S.C. § 637(a) (Supp. V 1993). A & S Council Oil Company, Williams Fuel Oil Service, and L.H. Smith Oil Corporation qualified to participate in the program and entered into one or more subcontracts with the SBA to supply petroleum products to military bases and other government installations from 1981 to 1985. In 1987 they filed this suit, alleging that they had been unable to make a profit on the subcontracts because of the method used to determine the contract prices.

That method was established in a December 5, 1979 "Interagency Agreement" between the SBA and the Defense Logistics Agency, a division of which, the Defense Fuel Supply Center, purchases petroleum products for use by the military and other federal agencies. This Agreement governed all procurements of petroleum products by the DFSC from § 8(a) companies from its execution through 1985; it thus covered all the subcontracts relevant to this case. Under its terms, § 8(a) subcontracts to supply petroleum products were to be at a "fair market price", which the Agreement defined as the "highest award price for the competitively solicited items (by type of product and method of delivery)" for a particular commercial market area. Thus, where multiple contracts had been competitively awarded for the same product in the same area, the § 8(a) companies would receive a price equal to the highest of the awarded prices. If only one similar contract had been awarded in a given area, that contract set the "fair market price". The SBA used the formula to calculate the price at which it offered each of the subcontracts in question to plaintiffs. On learning the "fair market price", of course, plaintiffs could have declined to contract; in no case were § 8(a) companies compelled to enter contracts.

In their original complaint, plaintiffs based their claims of district-court jurisdiction and waiver of sovereign immunity on the SBA's "sue and be sued" clause, 15 U.S.C. § 634(b)(1); the grant of federal question

jurisdiction, 28 U.S.C. § 1331; the Administrative Procedure Act, 5 U.S.C. § 702; and the Tucker Act, 28 U.S.C. § 1346(a)(2), as well as other statutes no longer relevant. They sought money damages of $15 million and declaratory relief on the basis of six counts, the first four of which the plaintiffs abandoned in district court. See *A & S Council*, 799 F.Supp. at 1226. Count V recited SBA regulations implementing § 8(a), as well as SBA Standard Operating Procedures, which stated that SBA policy was to enter into subcontracts that would allow companies to earn a "reasonable profit". It asserted that the SBA's conduct in negotiating and implementing the Interagency Agreement "was contrary to SBA rules and policies [and] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Count VI claimed that the Small Business Act did not authorize the Administrator "to enter into agreements fixing prices to be paid by federal procuring agencies to subcontractors under the 8(a) program", a claim that (at least by the time of this appeal) appears to rest on 15 U.S.C. § 637(a)(3), which provides that a small business selected to perform a procurement contract under this program "shall, when practicable, participate in any negotiation of the terms and conditions of such contract." Thus, the theory runs, the SBA exceeded its statutory authority and its own regulatory constraints by negotiating and implementing the Interagency Agreement.

The district court initially understood plaintiffs to be making contract claims. Finding that under the Tucker Act and the Contract Disputes Act the district court lacked jurisdiction over claims in excess of $10,000 arising out of contracts with the government, the court transferred the case to the United States Claims Court.[1] *A & S Council Oil Co., Inc. v. Abdnor*, Civ. No. 87–1969–OG, Mem. op. at 13–15, 1988 WL 23258 (D.D.C. March 2, 1988).

Once transferred, plaintiffs encountered another problem. The Claims Court held that, to the extent that the plaintiffs' claims were grounded on the CDA, it too lacked jurisdiction, because plaintiffs had failed to satisfy jurisdictional exhaustion requirements. *A & S Council Oil Co., Inc. v. United States*, 16 Cl.Ct. 743, 748 (1989). Two of the plaintiff companies, Williams and Smith, had never submitted their claims to a contracting officer. The third, A & S Council, had submitted a claim and lost, but then had failed to perfect a timely appeal to either the Armed Services Board of Contract Appeals or the Claims Court. *Id.* at 746.[2] In considering whether to retransfer the case to the district court, however, the Claims Court found that none of the claims involved "damages stemming from contract performance or non-performance". Rather, it viewed plaintiffs as seeking "damages for alleged illegal conduct occurring in and around October 1979 when the Interagency Agreement was executed, which injuries were subsequently quantified after entering into the contracts." *Id.* at 748. It therefore transferred the case back to the district court under 28 U.S.C. § 1631 (1988).

Once back in the district court, the parties filed cross-motions for summary judgment, and plaintiffs abandoned the Tucker Act as a basis for jurisdiction, saying that they "have not characterized their complaint as sounding ... in contract." See Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment, at 2. The district court then granted summary judgment for plaintiffs on Counts V and VI. It found statutory violations by the SBA and, without further explanation, characterized plaintiffs' resulting losses as an unconstitutional taking of their property. *A & S Council*, 799 F.Supp. at 1238–39. On March 26, 1993, after further briefing, the court issued an opinion defining the scope of plaintiffs' recovery—"the profit margins they should have earned on their sub-

---

**1.** During the course of this litigation, the United States Claims Court was renamed the Court of Federal Claims. See Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506. This opinion will simply refer to it as the "Claims Court".

**2.** Indeed, even the July 17, 1987 filing in the district court was beyond the 12-month period allowable for suit in the Claims Court challenging the adverse decision of a contracting officer, which occurred April 2, 1986. See 41 U.S.C. § 609(a)(3); *A & S Council Oil Co., Inc. v. United States*, 16 Cl.Ct. at 744, 746.

contracts"—and referred the calculation of damages to mediation. *A & S Council Oil Co., Inc. v. Saiki,* Civ. No. 87–1969–OG, Mem. op. at 4, 1993 WL 787241 (D.D.C. Mar. 26, 1993). As a result of the mediation, the parties fixed the amount to which plaintiffs would be entitled under the finding of liability; both parties reserved the right to appeal various issues. On September 18, 1993, the district court entered its final order and judgment in accordance with the parties' partial settlement. *A & S. Council Oil Co., Inc. v. Bowles,* Civ. No. 87–1969–OG, Mem. op. (Sept. 18, 1993). The SBA filed a notice of appeal on November 3, 1993.

\* \* \*

■ As a threshold matter, plaintiffs contend that we lack jurisdiction because the SBA failed to appeal within 60 days of the district court's March 1993 order defining the scope of recovery and referring the quantification issues to mediation. See 28 U.S.C. § 2107(b) (specifying 60 days as time limit for filing appeal in action in which the United States is a party); Fed.R.App.P. 4(a)(1) (same). They assert that that order left undone only a "mechanical and uncontroversial" determination of damages and was therefore final and appealable. See, e.g., *Parks v. Pavkovic,* 753 F.2d 1397, 1401 (7th Cir.1985).

We disagree. In *Parks* the damage computation remaining involved only submission by plaintiffs of "receipts or other evidence showing what they have paid or still owe", matters that the court found "unlikely to engender dispute or controversy" and "requir[ing] no analytic or judgmental determinations that might ... give rise to other appealable questions." 753 F.2d at 1402; cf. *St. Mary's Health Center v. Bowen,* 821 F.2d 493, 497–98 (8th Cir.1987) (mere need to calculate sum of damages, where amounts to be added were listed in the record and undisputed, does not destroy finality of order). Here the district court recognized that the damage calculations were the subject of controversy and thus provided not only for mediation but also for the possibility that mediation would fail. Mem. op. of Mar. 26 at 12. Indeed, the mediation lasted several days as the parties' experts debated the issue of the

proper "profit" to award plaintiffs. Therefore, the case became appealable only when the district court entered a judgment with the amount of damages. See *Apex Fountain Sales, Inc. v. Kleinfeld,* 27 F.3d 931 (3d Cir.1994) (appeal premature where order to determine amount of damages by submission to an audit leaves a highly contested dispute as to calculation of net profit). Defendant's appeal was timely filed.

\* \* \*

■ Because the SBA is an agency of the United States, it enjoys sovereign immunity except to the extent waived, "and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941). To determine whether any asserted waiver is applicable, we must classify plaintiffs' claims. This is no easy matter here. Counts V and VI use such language as "arbitrary and capricious" and "in excess of statutory authority", which makes them sound like APA claims, yet plaintiffs pray for money damages of $15 million, relief that the APA's waiver of sovereign immunity explicitly excludes. See 5 U.S.C. § 702 (limiting waiver to actions "seeking relief other than money damages"); see also *Hubbard v. Administrator, EPA,* 982 F.2d 531, 532 (D.C.Cir.1992) (en banc).

■ Both parties now suggest that insofar as plaintiffs raised a takings claim, there is jurisdiction in the district court under the SBA's "sue-and-be-sued" clause, 15 U.S.C. § 634(b)(1), notwithstanding possible negative implications from the Tucker Act's grant of jurisdiction over takings claims to the Claims Court, 28 U.S.C. § 1491(a)(1). We do not reach that issue, however, for we see no way in which plaintiffs' assertions can properly be classified as "takings" claims. Plaintiffs made no takings claim in their complaint. The term first appeared in this litigation, as far as we have been able to determine, in an eight-line throwaway passage in plaintiffs' March 18, 1991 "Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment", pp. 10–11. Another eight lines appear in "Plaintiffs' Reply Memorandum in Support of Mo-

tion for Summary Judgment", p. 3. The concept is then invoked summarily in the district court's opinion on the merits, first in a conclusory statement that the case arises under the takings clause, *A & S Council*, 799 F.Supp. at 1229, 1234, and in its merits conclusion that the SBA's "unjust enrichment amounts to a taking", *id.* at 1238–39. So far as we can tell, it was not until their responsive brief on appeal that plaintiffs even tried to identify a property interest that might have been taken, naming their "regulatory entitlement ... to earn a fair return (i.e., profit) on their investments in these 8(a) contracts, without interference from the operation of the Interagency Agreement." More specifically, they say that the Interagency Agreement:

> is analogous to the rate order which is the focus of state utilities Takings Clause cases, wherein investment returns might be so unjust as to be confiscatory not only of the assets but also of the anticipated return on those assets. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).

There is, however, no analogy whatever between the government's imposition of a rate order that restricts a firm's ability to price its goods or services in the market and thereby earn a return on its investment, and the government's offer of a contract at a fixed price that ultimately proves unprofitable for a person who steps forward to grasp the offer. While the rate order affirmatively reduces the firm's opportunities to earn a return, the contract offer at worst adds an unattractive opportunity to those otherwise available. Accordingly, there is not even an arguable takings claim in sight. Thus we need not resolve the relationship between the SBA's "sue-and-be-sued" clause and the Tucker Act as an arguably exclusive avenue for takings claims.

■ The government has contended throughout the course of this litigation that plaintiffs' claims are contract claims that should be channeled to the Claims Court and Federal Circuit and subject to the CDA's jurisdictional exhaustion prerequisites. As a conceivable alternative, however, it suggests that the claims that the SBA violated various statutory provisions such as the APA and 15 U.S.C. § 637(a)(3) (Congress' statement that a small business selected for a contract "shall, when practicable, participate in any negotiation of the terms and conditions of such contract") might be viewed as statutory torts. As such, the government suggests, they could possibly be tort claims *not* cognizable under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, and therefore not barred by plaintiffs' failure to comply with the procedural requirements of the FTCA. Under this theory, the SBA would be subject to suit under its "sue-and-be-sued" clause. See *FDIC v. Meyer*, —— U.S. ——, —— –——, 114 S.Ct. 996, 1000–04, 127 L.Ed.2d 308 (1994). (Needless to say, the government contends that, notwithstanding jurisdiction, the claims are meritless.)

■ We conclude, however, that the district court was right the first time around and the Claims Court wrong: (1) these are contract claims (2) that are governed by the CDA. In light of the "general principle that a federal court may determine its own jurisdiction", *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528, 533–34 (D.C.Cir.1988), we do not defer to the Claims Court finding, despite the interest in a uniform understanding of the boundaries of federal court jurisdiction. Moreover, as we develop below, the Claims Court's ruling in this case has been decisively rejected by its reviewing court, the Federal Circuit. See *LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed.Cir.1995).

The CDA on its face requires submission to the suitable agency contracting officer of "[a]ll claims by a contractor relating to a contract", 41 U.S.C. § 605(a), where the term "contract" embraces "any express or implied contract ... entered into by an executive agency for ... the procurement of property, other than real property in being," *id.* § 602(a). There can be no serious doubt that the plaintiffs entered into contracts for the procurement of property (petroleum products and their delivery) with executive agencies (the SBA and the Defense Fuel Supply Center). See *id.* § 601(2). Only two questions thus remain: whether the claims are "relat[ed] to" the contracts in the sense in-

tended by § 605(a), and if so, whether the provisions of the CDA are exclusive, especially in light of the SBA's "sue-and-be-sued" clause.

In *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C.Cir.1982), we held that the determination of whether an action is " 'at its essence' a contract action [for purposes of the parallel provisions of the Tucker Act, 28 U.S.C. §§ 1346(a), 1491] depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.* at 968. We said that the court must not interpret the Tucker Act's provisions for exclusive jurisdiction "in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government", *id.,* and on that ground permitted a reverse-Freedom of Information Act claim even though there was some possibility that it might turn on issues of contract interpretation. We stressed that the plaintiff sought no money damages against the United States, *id.* at 969, presumably because money damages are a prototypical contract remedy and are, in addition, excluded from § 702's waiver of sovereign immunity.

In this case, the issues of the source of the rights and the nature of the remedy are inextricably linked. Plaintiffs sought money damages of $15 million. It is at least problematic to say that they base their claims on the APA or the SBA's enabling act when the provisions relied on cannot possibly provide the relief sought. The only other relief requested—a declaratory judgment as to the validity of an Interagency Agreement that expired 10 years ago—was clearly moot when plaintiffs first filed suit.

The point on which the Claims Court rested—that the claimed acts of illegality were statutory violations anterior to the contract formation—does not seem to us to render the claims non-contractual. In the first place, any number of standard contract doctrines, such as duress and mistake of fact, involve

pre-contract behavior. And indeed, in explaining plaintiffs' alleged losses, the language of the complaint evokes these very doctrines. Thus it speaks (falsely) of plaintiffs "being required to accept" the offered prices, Complaint ¶¶ 50, 52, suggesting a claim of duress. And its contention that the prices "did not reflect the real costs of ... small oil companies", *id.* at ¶ 50, suggests some sort of mistake of fact.

Further, the alleged damages arose from and were defined by the combination of the anterior illegality with plaintiffs' signing of and performance of the contracts, as plaintiffs explicitly allege. See Complaint at ¶ 53 (stating that the injuries flowed from their "performing" the contracts). In a recent decision, *LaBarge Products, Inc. v. West,* 46 F.3d 1547 (Fed.Cir.1995), the Federal Circuit found that precisely that combination called for CDA jurisdiction. LaBarge had submitted the low bid on a procurement contract, but the Army chose not to accept it, instead asking bidders for their "best and final offers". At that point, LaBarge submitted a substantially lower bid, which the government accepted. LaBarge performed the contract, but then submitted a claim for reformation of the contract to the original bid price, and for extra compensation, on the grounds that the second bid solicitation violated government contracting regulations and an implied contract of fair treatment of bidders.

The government argued unsuccessfully that such claims of anterior illegality made the case analogous to "disappointed bidder" cases, for which many circuits, including ours, have found jurisdiction in the district court.[3] In such cases the relief sought is not money damages but cancellation of the award to the winner. See, e.g., *Chemung County v. Dole,* 781 F.2d 963, 967 (2d Cir.1986). In *LaBarge,* however, because the alleged illegality "could have affected the price of the [signed contract], there can be no doubt that a claim based on these [illegalities] 'relates

3. See *Irvin Industries Canada, Ltd. v. United States Air Force,* 924 F.2d 1068, 1072 n. 45 (D.C.Cir.1990); *Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1057 (1st Cir.1987); *Chemung County v. Dole,* 781 F.2d 963, 967 (2d Cir.1986); *Choctaw Manufacturing Co. v. United States,* 761 F.2d 609, 619 (11th Cir.1985); *Coco Brothers, Inc. v. Pierce,* 741 F.2d 675, 677–79 (3d Cir.1984); *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1374–76 (Fed.Cir.1983).

to' that contract. The causal connection establishes the requisite relationship." 46 F.3d at 1553. Further, the relief sought—reformation and additional compensation under the signed contract—"clearly 'relate[d] to' the contract." *Id.;* see also *Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 894 (D.C.Cir.1985) (where plaintiff would have had no affirmative claim but for his contract rights, action was under Tucker Act even though plaintiff alleged violations of Debt Collection Act).[4] Here, too, plaintiffs seek money damages for injury allegedly caused by their performance of a contract tainted by illegality in its making—the measure of damages awarded by the district court being, as we noted before, "the profit margins they should have earned on their subcontracts". *A & S Council Oil Co.,* Mem. op. at 4 (Mar. 26, 1993).

It is true that plaintiffs have disavowed the notion that they are making contract claims. Instead, they say, the damages they have suffered flow from unlawful agency action. That is in a sense true, though no more so than in *LaBarge* or *Spectrum.* In any event, plaintiffs' labelling is of little importance. As we said in *Ingersoll–Rand Co. v. United States,* 780 F.2d 74 (D.C.Cir.1985), "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract." *Id.* at 77. Where the alleged damage is entirely due to and measured in reference to plaintiffs' performance of a contract, and is exclusively money damages, plaintiffs' claim that the wrong originated in some statutory violation does not strip the case of its contractual character.

\* \* \*

■ Having concluded that these claims are related to plaintiffs' government contracts within the meaning of §§ 602(a), 605(a), we come to the second question, the exclusivity of the CDA. We have recognized a "congressional intent to provide a single,

uniquely qualified forum for the resolution of contractual disputes", *Ingersoll–Rand,* 780 F.2d at 78, so that, for claims over $10,000, the Claims Court has exclusive jurisdiction except to the extent that Congress has "granted any other court authority to hear the claims that may be decided by the Claims Court." *Bowen v. Massachusetts,* 487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 2740, 101 L.Ed.2d 749 (1988).

Here the only plausible source of such alternative authority is the SBA's "sue and be sued" clause. Indeed, *FDIC v. Meyer* construed a similar "sue and be sued" clause "to have fully waived immunity", —— U.S. at ——, 114 S.Ct. at 1003, and the Ninth Circuit has held that the SBA's "sue and be sued" clause allows contract claims in district court unconstrained by the CDA's administrative exhaustion prerequisites. *In re Liberty Construction,* 9 F.3d 800, 801 (9th Cir.1993).

The Contract Disputes Act, however, appears to be the paradigm of a "precisely drawn, detailed statute" that preempts more general jurisdictional provisions. *Brown v. GSA,* 425 U.S. 820, 834, 96 S.Ct. 1961, 1968–69, 48 L.Ed.2d 402 (1976). It purports to provide final and exclusive resolution of all disputes arising from government contracts covered by the statute. "All claims by a contractor against the government relating to a contract" covered by the CDA must be submitted first to the contracting officer for a decision. 41 U.S.C. § 605(a). The contracting officer's decision on the claim "shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." *Id.* § 605(b). Such appeals may be made only to the appropriate agency board of contract appeals or directly to the Claims Court, id. §§ 606, 609(a)(1) & (3), but either way, the next appeal lies only to the Federal Circuit. *Id.* § 607(g)(1), 28 U.S.C. §§ 1295(a)(3) & (10).

4. In *Hamilton Stores, Inc. v. Hodel,* 925 F.2d 1272 (10th Cir.1991), plaintiff sought relief for an agency's award of a contract to another, allegedly in violation of plaintiff's contract-created preferential rights, seeking the opportunity to provide the services covered by a challenged contract, thus melding a contract claim into a disappointed bidder claim. *Id.* at 1279. The court found district court jurisdiction. As plaintiff was seeking access to a new contract opportunity, the analogy to a disappointed bidder litigation was plainly much closer in *Hamilton* than here or in *LaBarge,* so we need not decide whether we would follow *Hamilton.*

By its express terms, the CDA applies to "executive agenc[ies]", 41 U.S.C. § 602(a), which § 601(2) defines as encompassing not only "executive department[s]" but also (1) "independent establishment[s]" as defined in 5 U.S.C. § 104, namely "an establishment in the executive branch [with certain irrelevant exceptions] which is not an Executive department, military department [or] Government corporation", plus (2) a variety of other entities including many of the entities excluded from the definition in 5 U.S.C. § 104, such as Government corporations, the U.S. Postal Service and the Postal Rate Commission. Despite these sweeping terms, it might still be the case that the SBA's sue-and-be-sued clause permitted review of contract disputes outside the CDA framework. Congress's explicit exceptions from the CDA, however, render any such inference highly improbable. Although a sue-and-be-sued clause governs the Tennessee Valley Authority, see 16 U.S.C. § 831c(b) (1988), Congress expressly exempted a limited class of TVA contracts from the CDA, see 41 U.S.C. § 602(b). The exemption would have been wholly unnecessary unless Congress assumed that a sue-and-be-sued clause would not trump the CDA's exclusivity provisions.

\* \* \*

Because plaintiffs' claims can only be characterized as ones "relating to" executive agency contracts and covered by the CDA, and it is undisputed that they failed to exhaust the jurisdictional remedies required for relief under the CDA, there is no need to transfer the case to the Claims Court. We therefore reverse the judgment of the district court and remand the case with instructions to dismiss.

*So ordered.*